UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

IN THE MATTER OF THE APPLICATION )
OF THE UNITED STATES OF AMERICA )
FOR A WARRANT AUTHORIZING THE )
INSTALLATION AND MONITORING OF )
TRACKING DEVICES IN OR ON: )
)
(1) A 2007 CADILLAC ESCALADE, ) CASE NO. 13-1717 SKG
BEARING MARYLAND LICENSE )
PLATE 2A10439 AND VIN# )
1GYFK63857R351141; ) 13-1718 SKG
and )
(2) A GRAY MERCEDES BENZ R350 )
MINIVAN BEARING MARYLAND )
LICENSE PLATE 2A19455. )

### AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR THE INSTALLATION AND MONITORING OF TRACKING DEVICES

Thomas Martin, a Special Agent with the Drug Enforcement Administration ("DEA"), being duly sworn, states:

### INTRODUCTION

1. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

2. I have been employed as a Special Agent with the DEA since 1988. Since becoming an employee of DEA, I have participated in numerous investigations regarding the Controlled Substances Act. I have participated in the recovery of substantial quantities of narcotics, paraphernalia, and financial proceeds related to drug activity. I have also participated in numerous surveillance operations of Title 21 U.S.C. violators. I have participated in Title III operations, comprising of surveillance operations, monitoring wire interceptions, and analyzing telephone records. Through my

1

training and experience I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, and with the method of payment for such drugs.

3. This affidavit is being submitted in support of applications for two warrants authorizing the installation and use of tracking devices on the two subject vehicles described in this paragraph ("Subject Vehicles"). Based upon the facts set forth below, I submit that there is probable cause to believe that

> **A 2007 Cadillac Escalade displaying Maryland license plate 2A10439, Vin# 1GYFK63857R351141, registered to GSF ENTERPRISES, 11711 Reisterstown Road, Reisterstown, MD,**

(the "Escalade"), and also that

> **A gray Mercedes Benz R350 minivan bearing Maryland license plate 2A19455, VIN unknown, registered to Keswick Auto Repair LLC,**

(the "Mercedes"), are presently being used in furtherance of violations of Title 21 United States Code Sections 841 and 846, to wit; possession with the intent to distribute controlled substances and conspiracy to commit that same offense. Further, I submit that there is probable cause to believe that the installation of tracking devices in or on the two Subject Vehicles, and use of the tracking devices, will lead to evidence, fruits, and instrumentalities of the aforementioned crimes as well as to the identification of individuals who are engaged in the commission of those and related crimes.

4. Because this affidavit is being submitted for the limited purpose of establishing probable cause to support the installation and use of tracking devices, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause. I have not, however, excluded any information known to me that would defeat a determination of probable cause. The information contained in this Affidavit is based upon my personal knowledge, my review of documents and other evidence, and my conversations with other law

2

enforcement officers and other individuals. All conversations and statements described in this Affidavit are related in substance and in part unless otherwise indicated.

## PROBABLE CAUSE

5. In October and November 2010, DEA agents interviewed a cooperating defendant who provided information regarding the drug trafficking activities of George Sylvester FRINK. The cooperating defendant ("CS1") stated that CS1 had been obtaining kilogram quantities of cocaine, since 2007, from an individual known as Paul ALEXANDER. CS1 identified one of ALEXANDER'S cocaine sources as Charles RANSOM. CS1 stated that RANSOM is originally from Baltimore but moved to California several years ago, and that RANSOM was a cocaine distributor who shipped kilograms of cocaine via FedEx delivery.

6. Your affiant knows that RANSOM was indicted in November 2010 in the Central District of California and charged with Participation in a Conspiracy to Distribute Cocaine in violation of 21 USC Section 846. RANSOM was a fugitive until March 2013, when he was arrested in California. According to the case agent, RANSOM was a member of a cocaine organization that was transporting hundreds of kilograms of cocaine from California to Maryland from 2008 through 2010.

7. CS1 stated that CS1 routinely got kilograms of cocaine from ALEXANDER at a bar called "On the Rocks" on Liberty Road in Randallstown, Maryland. CS1 stated that CS1 sold the cocaine for cash and that some of this cash then was paid to ALEXANDER at the same Liberty Road bar. CS1 stated that ALEXANDER had a cocaine partner named George FRINKS, and that FRINKS would be with ALEXANDER at the meetings at On The Rocks Bar. According to CS1, FRINKS had a financial interest in the bar.

8. Maryland Department of Assessments and Taxation (MDAT) records indicate that on November 18, 2009, a trade name application was filed and approved for the trade name ON THE

3

ROXX. The business is listed with an address of 9036 Liberty Road, Randallstown, MD, and the records identify George FRINK as the "president owner."

9. In February 2011, agents interviewed a Cooperating Source, hereafter referred to as CS2, regarding a Drug Trafficking Organization (DTO) that was transporting hundreds of kilograms of cocaine per month from California to Maryland. CS2 identified the leader of the California based DTO as Heriberto "Eddie" Lopez, aka Big Dog (hereinafter referred to as Lopez). CS2 also identified Ricky Brascom as a California based cocaine distributor to whom Lopez supplied kilograms of cocaine.

10. CS2 identified Charles Dwight Ransom as a cocaine distributor from Maryland who was living in California and was a member of the LOPEZ-BRASCOM DTO. CS2 also identified Maryland businessman Gerald Lamont JONES as a close associate of Ransom. CS2 had introduced Ransom to Lopez in 2008 for the purpose of providing Ransom with a source of supply for cocaine. A short time after this introduction, JONES flew out to California and Ransom introduced JONES to LOPEZ. CS2 stated that at the time of this introduction, Ransom described JONES to CS2 as Ransom's partner in the cocaine distribution business. According to CS2, JONES is the owner of PIMLICO MOTORS in Baltimore, MD; as well as the owner of Gold's Gym in Owings Mills, MD and the owner of a construction company.

11. According to CS2, from 2008 through October 2010, the LOPEZ-BRASCOM DTO shipped hundreds of kilograms of cocaine from California to Maryland for subsequent distribution by JONES and others. In 2008, Ransom and JONES initially provided LOPEZ and BRASCOM with vehicles that had concealed compartments to be utilized to secrete cocaine and money. CS2 stated that BRASCOM would load the vehicles with cocaine, and then BRASCOM and LOPEZ would load them on tractor-trailer auto-carriers that were destined for Baltimore, Maryland. CS2 stated that BRASCOM and LOPEZ would place multiple vehicles containing cocaine on each car carrier; and that each car carrier would have 50 to 120 kilograms of cocaine on them. Once the cocaine was distributed in Maryland, the

money from the cocaine sales would then be secreted in the cars and shipped back to California for the vehicles to be used again to transport cocaine to Maryland. The people driving the auto transport trailers worked for Ransom.

12. CS2 stated that in 2009, the CS2 began traveling to Baltimore to assist in the distribution of the cocaine that was shipped from California. CS2 met JONES' car carriers on three occasions, and helped drive the cars containing the cocaine to a townhouse in Owings Mills, Maryland. CS2 stated that he was aware of approximately 10 shipments of cocaine that were delivered from California to JONES via car carrier tractor-trailers. In May 2009 a Honda Ridgeline was being transported on an auto transport trailer from California to Pimlico Motors located on Liberty Road in Baltimore, Maryland. The trailer was stopped by law enforcement and cocaine was seized. This was the last time the LOPEZ DTO used the auto transport trailers to transport the cocaine to Maryland.

13. According to CS2, after the seizure, the DTO changed the transportation method used to smuggle the cocaine from California to Maryland. The cocaine was secreted within legitimate tractor trailer cargo traveling from California to Maryland. CS2 estimated that this method was used two times a month for a year. The DTO usually shipped 50 to 120 kilograms at a time. CS2 stated that of these shipments, at least one of the shipments sent to JONES was 200 kilograms of cocaine; and there was also a shipment to JONES of 150 kilograms of cocaine using this method. They used this tractor trailer method until approximately February 2010.

14. CS2 stated that in 2009, Brascom started meeting the cargo trucks in Baltimore and then distributing the smuggled shipments of cocaine that were contained within the cargo. A large amount of the cocaine was delivered by Brascom to JONES; while other amounts were distributed by Brascom to customers in Pennsylvania, New Jersey, and Virginia who were not associated with JONES. Typically, there would be 50 to 60 kilograms of cocaine that went to JONES. CS2 estimated that there were 24 shipments made via the cargo trucks. CS2 stated that JONES or one of JONES' couriers usually

picked the cocaine up from BRASCOM at a hotel (usually the Hyatt Place, Owings Mills, Maryland). CS2 estimated that this occurred 30 times during 2009. However, on approximately five occasions, CS2 took cocaine to JONES at a townhouse. On several of these trips, CS2 saw JONES and his right hand man, whom CS2 knew as "George" or "G," counting large quantities of money inside the townhouse. CS2 also stated that he saw couriers dropping off money to JONES at the townhouse. CS2 identified George Sylvester FRINK from FRINK'S Maryland driver's license photograph as "George" or "G".

15. According to CS2, in 2009 BRASCOM became worried that the townhouse JONES was using as a stash house in Owings Mills, MD would be detected by law enforcement. BRASCOM contacted JONES for assistance in finding the new stash house.

16. CS2 stated that JONES found 11711 Reisterstown Road, Reisterstown, Maryland as the new stash house. CS2 stated that both BRASCOM and JONES had keys to this location. CS2 stated that from then on, the DTO used 11711 Reisterstown Road as a stash location for the cocaine that was shipped to Maryland; as well as utilized to store US currency from the cocaine sales.

17. Your affiant knows that Ricky BRASCOM, Heriberto "Eddie" Lopez, and Charles RANSOM and others were indicted in the Central District Of California in November, 2010 for federal cocaine trafficking charges. BRASCOM was arrested and convicted, while Lopez and Ransom fled from law enforcement and became fugitives. RANSOM was arrested in March, 2013, and Lopez is still at large.

18. In August 2011, DEA agents identified an apartment in Pikesville, Maryland that was being leased by George FRINK. The lease records for that apartment included copies of two earnings statements showing that FRINK was employed by Rami Brothers, Inc/Pimlico Motors. In the parking space assigned to FRINK'S apartment was a silver Acura bearing Maryland license plate **2A10439**, which is an interchangeable Maryland auto dealer's tag registered to GSF ENTERPRISES at 11711 Reisterstown Road. MDAT records show that GSF ENTERPRISES is an active Maryland

Corporation formed by George Sylvester FRINK on December 21, 2004, for the purpose of investing in real estate.

19. Surveillance of the silver Acura subsequently identified the operator of the Acura as Antonio Harris. On September 21, 2011, agents saw Harris leaving a hotel in Pikesville with a large duffel bag. During a subsequent traffic stop, officers seized approximately $100,000 in cash, and a gelatin capsule containing heroin, and Harris stated that he worked for GSF ENTERPRISES. A subsequent search of the hotel room linked to Harris resulted in the seizure of approximately three kilograms of heroin and the arrest of two individuals from New York. Agents later learned from another informant that the aforementioned apartment, leased by FRINK, was used by Harris to store drug proceeds, and to process and package heroin for retail distribution. FRINK'S lease of this apartment has since terminated.

20. In early June 2013, agents conducted a drive-by surveillance of 11711 Reisterstown Road and they saw a van parked in front of the building. The van had the words "Pimlico Motors" emblazoned on the side, as well as other promotional words and phone numbers relating to Pimlico Motors, which, according to the lease documents pertaining to the apartment used by HARRIS, was FRINK's employer. An unidentified male got out of the van and appeared to be waiting for someone. A short time later, a black Cadillac Escalade sport utility vehicle (SUV) parked in the driveway in front of 11711 Reisterstown Road, and on the vehicle was Maryland license plate **2A10439**, which was the same plate used by Antonio HARRIS in September 2011.

21. Agents noticed that the door of the attached garage had been raised, and a white Chevrolet SUV was moving slowly out of the garage. The vehicle stopped in the driveway, and a man later identified as George Sylvester FRINK got out of the driver's side. FRINK met with the unidentified driver of the Pimlico Motors van, and then both men opened the rear passenger doors and tailgate of the white Chevrolet SUV. Periodically, both men would lean in to the rear passenger area of both sides of the

white SUV. They would also lean into the rear of the SUV; and occasionally retrieve unidentified objects from the PIMLICO MOTORS van.

22. After approximately thirty minutes of continuing activity by FRINK and the unknown male at or in the rear of the Chevrolet SUV, agents observed FRINK enter the black Cadillac Escalade and drive out of the area. Surveillance of 11711 Reisterstown Road continued as the unidentified man continued to go in and out of the garage and various areas of the rear of the white Chevrolet SUV.

23. About an hour later, agents observed that the rear doors of the Chevrolet SUV were closed, and agents saw the unidentified man place a long object into the rear passenger area of the white SUV. This long object resembled a cargo cover commonly used in sport utility vehicles to conceal from view objects that are being stored in the cargo area of the SUV. The unidentified male subsequently drove away in the Pimlico Motors van, which was bearing Maryland license plate 2A08768, which is another Maryland interchangeable auto dealer plate, this one registered to Rami Bros. Inc, 5304 Park Heights Avenue, Baltimore. MDAT corporate records show that Rami Bros. Inc is an active Maryland corporation owned by Gerald Lamont Jones, utilizing the trade name Pimlico Motors.

24. Surveillance of the white Chevrolet SUV continued, and at approximately 4:18 pm on the same day, agents saw FRINK return to 11711 Reisterstown Road and park the black Escalade next to the white Chevrolet SUV. Agents saw FRINK enter the white SUV and back it into the garage and close the garage door. A short time later, agents saw FRINK walk from 11711 Reisterstown Road while carrying a backpack in each hand. Each backpack appeared to be heavily weighted, with rectangular shapes protruding on the exterior of one of the bags. Based on my training and experience, I recognized the rectangular shapes to be the same size and shape as kilogram packages of cocaine or heroin. FRINK got into the Cadillac Escalade and drove away from the area. He stopped at 8 Church

Lane in Pikesville, Maryland, left and then returned to 8 Church Lane. There he met with a man driving a black truck with a short cargo bed bearing another Maryland interchangeable auto dealer's tag.

25. About 90 minutes later, a Baltimore County Police uniformed officer conducted a traffic stop of FRINK's Cadillac Escalade. During the stop, FRINK'S vehicle was identified as a 2007 Cadillac Escalade bearing Maryland tag **2A10439** with the VIN **1GYFK63857R351141**. The driver was identified as George Sylvester FRINK, JR.

26. A subsequent canine scan of the vehicle by a Baltimore County Police drug detector dog resulted in a positive alert for controlled substances. The vehicle was searched and the backpacks that FRINK took out of 11711 Reisterstown Road were not in the vehicle. But officers found five cellular phones, approximately $4,000 US currency, and a number of bank deposit receipts in the vehicle. The receipts showed more than $32,000 in cash deposits made to three different bank accounts in a four day period just about a week earlier. These deposit slips demonstrate that FRINK has been using the Escalade to make cash bank deposits. This type of structuring of cash deposits is routinely used by drug traffickers to move cash into the banks while avoiding having the bank file Currency Transaction Reports with the government. Although no drugs were found in the SUV, the positive drug dog alert confirms my observations of the kilogram shaped packages in the backpacks carried by FRINK and placed in the SUV earlier, and demonstrates that the Escalade was used and continues to be used in drug trafficking.

27. Based upon my training and experience, I believe that FRINK and the unidentified male who was driving the Pimlico Motors van removed a large quantity of drugs that had been hidden within the white Chevrolet SUV at 11711 Reisterstown Road. I believe that FRINK then took a quantity of the drugs in the two backpacks and transported them in the Cadillac Escalade, bearing Maryland tag **2A10439** with the **VIN 1GYFK63857R351141**, to the unidentified male at 8 Church Lane.

28. In June 2013, Maryland Motor Vehicle records show that plate **2A10439** is still assigned to an interchangeable auto dealer tag in the name of GSF ENTERPRISES ET AL, 11711 Reisterstown Road, Reisterstown, MD.

29. On July 1, 2013, agents utilizing the covert video camera were able to see JONES meeting with GRIFFIN on the parking lot of 8 Church Lane, Pikesville, MD. During the meeting, JONES was observed accessing the rear cargo area of a Range Rover SUV bearing Maryland license 1A98818, which is a Maryland interchangeable dealer license registered to JBL Construction LLC, 8027 Liberty Road, Baltimore, MD. JBL Construction LLC is a company owned by Gerald JONES. With Griffin standing beside him, JONES reached into the rear cargo area and removed a large stack of U.S. currency from a red bag, and then walked around to the rear passenger compartment area of the SUV. A short time later he returned to the rear of the Range Rover and did not have the U.S. currency in his hand. The stack of currency appeared to be more than two inches in thickness, and banded with rubber bands. Based upon your affiant's training and experience, drug traffickers commonly bundle, store, and transport large sums of drug trafficking proceeds in this manner, in order to allow faster and more efficient handling, counting, and concealment of the money. At the same time, this is not the sort of activity normally associated with car sales or real estate.

30. Also, on July 1, 2013, a video surveillance of the rear parking lot of 8 Church Lane, Pikesville, MD was conducted via a covert video camera. The video images captured show a gray colored Mercedes Benz minivan enter the parking lot at approximately 3:47 pm. A male later identified as Albert Louis Griffin, III, got out of the minivan and walked toward the front of the building out of view. The next day, July 2, 2013, video surveillance was again conducted on 8 Church Lane. During this surveillance, at approximately 12:50 pm, JONES parked a Range Rover SUV in the rear of the building and entered 8 Church Lane. Later that afternoon, agents saw JONES reposition the Range Rover further back in the rear of the lot; and then repositioned the Mercedes minivan so that the rear of the minivan was

10

next to the rear of the Range Rover. Agents monitored the camera as JONES appeared to remove several unidentifiable objects from the rear cargo area of the Range Rover, and placed them into the rear cargo area of the minivan. Based on my training and experience, JONES was moving bundles of cash into the minivan, preparing it for transportation out of state to purchase more kilograms of cocaine. As is mentioned above, JONES and his coconspirators in the drug business have a long history of moving drugs and money in this fashion.

31. Approximately five minutes after transferring objects from the Range Rover to the minivan, agents observed a gray colored Mercedes sedan enter the rear parking lot of 8 Church Lane. Griffin got out of the Mercedes sedan and shook hands with JONES on the parking lot. After a brief conversation, Griffin entered the Mercedes minivan and drove away. A week later, on July 8, 2013, Griffin returned and parked the Mercedes minivan on the lot of 8 Church Lane. The fact that the minivan was gone for a week is reason to believe that it had made a long distance trip. The Mercedes minivan was bearing a Maryland interchangeable auto dealer license plate number **2A19455**. According to Maryland Motor Vehicle records, that plate is registered to Keswick Auto Repair LLC. MDAT records indicate that Keswick Auto Center was formed by Rami Bros. in 2006. Griffin has a commercial trucking license. Because of the earlier activity by Jones and Frink and others using car carriers and commercial trucks to move drugs and money cross country, there is reason to believe that Jones and Frink are using Griffin to move the minivan to another state carrying money, and then returning carrying cocaine. In 2011, Griffin was the subject of a Baltimore County Police Department drug investigation.

32. Three days later, on July 11, 2013, a video surveillance monitored by agents showed JONES park the same Range Rover at the rear of the lot of 8 Church Lane. JONES then repositioned the same Mercedes minivan adjacent to the Range Rover, so as to cause the rear cargo areas to be next to each other. JONES opened the rear cargo door of both vehicles and removed a duffel bag from the Range Rover and set it on the ground between the vehicles. A female walked out of 8 Church

[handwritten addition: In addition, Griffin operates his own commercial trucking business but bank records show no check payments to Griffin from any of Jones's businesses. Also, surveillance agents have never seen Griffin or his truck at any of Jones's business locations. So, there appears to be no legitimate business relationship between Griffin and Jones. A commercial truck license is not logically related to the minivan observations.]

11

Lane, picked up the duffel bag, and carried it with her back into the building. As the surveillance continued, it appeared that JONES moved other unidentified objects from the Range Rover to the rear cargo area of the minivan. While JONES was transferring the objects into the minivan, Griffin arrived and placed a duffel bag into the minivan. Shortly thereafter, Griffin entered the minivan and drove it out of the area. Based on my training and experience and the totality of the circumstances mentioned above, I am convinced that JONES arrived at 8 Church Lane with a number of bags containing drug proceeds that he was sending with Griffin to take to the source of their cocaine, and that the minivan will make another week-long round trip, returning with cocaine.

33. Your affiant has reviewed bank records associated with JONES' and his companies for the time period 2008 through 2012. The bank records showed multiple cash deposits less than $10,000 being made into the same account, on the same day, at different branch locations of the same bank. Other bank records showed structured cash deposits being conducted by making cash deposits less than $10,000 in multiple bank accounts owned by JONES, on the same day. Bank records also showed multiple cash deposits less than $10,000 into JONES' bank accounts over a period of several days which your affiant believes was done in order to thwart the bank's detection and reporting. Bank records showed more than 380 cash deposits totaling more than $2,600,000 into JONES' various personal and business bank accounts during the time period January 1, 2008 through December 31, 2012. Based on my training and experience, this demonstrates that JONES has a substantial source of cash income that is not coming from the sale of cars, but is rather coming from his substantial drug business.

34. The bank records showed a pattern of deposits in the bank accounts for Pimlico Motors to come from checks and drafts from finance companies, credit unions, and related entities that are engaged in the business of making automobile loans. This demonstrates that cars sold by Pimlico Motors are routinely financed; so, there would not be a reason for large cash deposits by Pimlico or Jones.

12

35. Bank records also showed a pattern whereby structured cash deposits were made into JONES' personal bank account, and then cash was transferred monthly into JONES' other business accounts, such as Rami Bros. Inc., d/b/a PIMLICO MOTORS, JBL Construction LLC, from which business operating expenses were paid. Based on my training and experience, it is very common for large scale drug traffickers to use a front business, such as a used car dealership, to conceal the large income from drug sales.

35. Through the observations and surveillance of 8 Church Lane, Pikesville, MD, there does not appear to be any retail customer traffic patronizing the premises. There is no signage indicating any active or going business concerns located on the property.

36. On July 14, 2013, agents utilizing a covert video camera were able to see FRINK walk out of 11711 Reisterstown Road while wearing blue protective gloves and carrying a broom and dustpan. FRINK walked to the edge of the property and emptied the contents of the dustpan into the bushes on three occasions. A short time later, FRINK walked out of 11711 Reisterstown Road, no longer wearing the blue rubber gloves, carrying a red duffel bag which he placed in the rear passenger area of his black Cadillac Escalade. FRINK subsequently entered the Cadillac Escalade, where agents were able to see FRINK reaching backward into the rear passenger area and placing objects near the floor of the center console of the front of the vehicle. On one occasion, agents were able to see a rectangular object wrapped in plastic being moved from the rear passenger area to the front center console area of the vehicle. Based on training and experience, this is a common area used for a hidden compartment in drug cases.

37. Based upon your affiant's training and experience, your affiant knows that drug traffickers commonly use a concealed compartment, or "trap" to conceal contraband when it is being transported in vehicles. Your affiant also knows that drug traffickers commonly wear protective gloves when handling and processing controlled dangerous substances for subsequent distribution; and that such processing will generate dust and residue. Your affiant believes FRINK is utilizing 11711 Reisterstown

Road for storing and processing controlled substances. Your affiant believes that FRINK had utilized the blue protective gloves to remove dust and residue from the processing of controlled substances. Your affiant believes FRINK then removed a duffel bag containing kilograms of cocaine, and placed them into a concealed compartment area within the Cadillac Escalade. Your affiant believes the utilization of a concealed compartment would account for the positive canine alert during the June 4, 2013 traffic stop of FRINK. This activity confirms the information provided by BRASCOM about him telling JONES to get a better stash house to process drugs, and that JONES subsequently bought 11711 Reisterstown Road for that purpose. The observations of FRINK with the gloves and the dustpan, emptied three times in the bushes, demonstrates that the drug processing is continuing in the 11711 house just four days ago. It also supports the belief that FRINK removed a number of kilograms of cocaine from 11711 in two suitcases using the Escalade in early June. The conclusions about the ongoing drug activity and the use of the Escalade are further supported by the positive drug dog alert to the Escalade just hours after FRINK was seen placing the suitcases believed to contain cocaine into the Escalade at 11711.

## PRIOR USE OF GPS TRACKING

38. To the best of my knowledge, an electronic tracking device has not been used on a 2007 Cadillac Escalade displaying Maryland license **2A10439, VIN #1GYFK63857R351141**, registered to GSF ENTERPRISES ET AL, 11711 Reisterstown Road, Reisterstown, MD, or on the gray Mercedes Benz R350 minivan described herein.

## REQUEST FOR INSTALLATION AND USE OF GPS TRACKING DEVICE

39. As is set forth above, CS-1 has met and has identified FRINK as a cocaine source of supply, and CS1 has received cocaine that was provided by FRINK. Also, FRINK's interchangeable dealer tag **2A10439** was used by Antonio Harris on a vehicle used to transport drug proceeds and heroin. Also, DEA agents saw FRINK use the Escalade to transport backpacks suspected to contain controlled

dangerous substances. Also, during the recent traffic stop, there were a number of bank deposit slips in the vehicle that showed a series of cash deposits. Also, FRINK was seen transporting the backpacks to 8 Church Lane, where the gray minivan has been seen on a number of occasions apparently being loaded with items by Jones. Based on the foregoing, I submit that there is probable cause to believe that FRINK and his Cadillac Escalade and the gray Mercedes minivan are involved in drug distribution. It is likely that following FRINK's Cadillac Escalade, and following the Mercedes minivan will help to identify (1) the places that FRINK travels, (2) the individuals with whom Frink meets, (3) the places that the Mercedes minivan travels to when it leaves 8 Church Lane, and (4) the people associated with the locations visited by the Mercedes minivan. This information would help to further identify the scope of this on-going cocaine and heroin trafficking conspiracy and its participants. In order to track the movement of the SUBJECT VEHICLES effectively and to decrease the chances of detection, I am requesting authorization to install and place tracking devices in or on the two SUBJECT VEHICLES while they are in the District of Maryland.

40. Based on surveillance, there is no discernible pattern to FRINK's activity or the movement of the gray minivan, and it is impossible to predict when an opportunity will arise to place or install the tracking devices. Therefore, it is requested that the court authorize installation and removal of the tracking devices during both daytime and nighttime hours to ensure the safety of the executing officers and to avoid premature disclosure of the investigation.

41. In the event that the Court grants this application, there will be periodic monitoring of the tracking devices during both daytime and nighttime hours for a period of up to 45 days following installation of the devices. The tracking devices may produce signals from inside private garages or other such locations not open to the public or visual surveillance.

42. It is requested that the warrants and accompanying affidavit and application in support thereof, as they reveal an ongoing investigation, be sealed until further order of the Court in order

to avoid premature disclosure of the investigation, and better ensure the safety of Agents and Confidential Sources, except that copies of the warrants in full or redacted form may be maintained by the United States Attorney's Office, and may be served on Special Agents and other investigative and law enforcement officers of the DEA, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to execute the warrants.

43. As is demonstrated above, CS-1 has a relationship with FRINK that would allow FRINK to identify CS-1 based on information contained in this affidavit; consequently, FRINK could intimidate and possibly harm CS-1. Also, if notified about the requested warrants, FRINK could flee from prosecution and possibly destroy or tamper with evidence. Thus, there is reasonable cause to believe that providing immediate notification of the execution of the warrants would seriously jeopardize the investigation. In accordance with 18 U.S.C. section 3103a(b) and Federal Rule of Criminal Procedure 41(f) (3), I request that the Court also authorize the delay of notification of the execution of the warrants for a period of 30 days after the end of the authorized period of tracking (including any extensions thereof).

44. **WHEREFORE,** I respectively request that the Court issue two warrants authorizing members of DEA or their authorized representatives, including but not limited to other law enforcement agents and technicians assisting in the above-described investigation, to install tracking devices in or on the Subject Vehicles within the District of Maryland within 10 calendar days of the issuance of the requested warrants, and to remove said tracking devices from the Subject Vehicles after the use of the tracking devices has ended; to surreptitiously enter on to the Subject Vehicles to effect the installation, repair, replacement, and removal of the tracking devices; and to monitor the tracking devices, for a period of 45 days following the installation of the trackers, including when the tracking devices are

inside private garages and other locations not open to the public or visual surveillance, both within and outside the District of Maryland.

_____
Special Agent Thomas Martin
Drug Enforcement Administration

Sworn to before me this 18th day of July 2013.

_____
Susan K. Gauvey
United States Magistrate Judge

17